RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0172p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA ex rel. KATHI HOLLOWAY,

  *Relator-Appellant*,

  *v.*

HEARTLAND HOSPICE, INC.,

  *Defendant*,

HEARTLAND HOSPICE SERVICES, LLC; HCR MANORCARE, INC.; HCR HOME HEALTH CARE & HOSPICE, LLC; MANORCARE HEALTH SERVICES, LLC,

  *Defendants-Appellees*.

No. 19-3646

───────────────

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:10-cv-01875—James G. Carr, District Judge.

Decided and Filed:  June 3, 2020

Before:  MERRITT, MOORE, and MURPHY, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:**  Brad J. Pigott, PIGOTT LAW FIRM, P.A., Jackson, Mississippi, for Appellant. Eric A. Dubelier, Katherine J. Seikaly, REED SMITH LLP, Washington, D.C., James C. Martin, Colin E. Wrabley, Devin M. Misour, REED SMITH LLP, Pittsburgh, Pennsylvania, for Appellees.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  The *qui tam* provisions of the False Claims Act ("FCA") encourage whistleblowers to act as private attorneys general and sue companies making false claims for federal money.  *See* 31 U.S.C. §§ 3729–3733.  Kathi Holloway, the *qui tam* relator in this action, sued Heartland Hospice and related entities ("Heartland") under the FCA for orchestrating a corporate-wide scheme to submit false claims for payments from Medicare and Medicaid to cover hospice care.  Heartland allegedly enrolled patients in hospice when they were not terminally ill and kept them there, even when employees like Holloway urged their release.

Heartland, however, shoots back that Holloway is not a genuine whistleblower, that her claims are drawn from prior allegations against Heartland, and accordingly that her *qui tam* action is prohibited by the FCA's public-disclosure bar.  In the alternative, Heartland argues that Holloway has not satisfied the FCA's heightened pleading standard for allegations of fraud and, in particular, that she has not satisfied the limited exception to that standard that we announced in *U.S. ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 838 F.3d 750 (6th Cir. 2016). We hold that Holloway's action is barred in light of prior public disclosures.  We accordingly **AFFIRM** the district court's judgment of dismissal.

## I.  BACKGROUND[1]

Holloway alleges that Heartland fraudulently claimed Medicare and Medicaid payments to cover hospice care by "recruiting" and keeping patients in hospice despite the fact that many of them were not terminally ill.  R. 69 (1st Am. Compl. at 11–12, ¶ 24) (Page ID #485–86).[2] Because these patients were placed into hospice, they were not provided curative treatment for

---

[1]The facts are taken from Holloway's First Amended Complaint, as we take all factual allegations to be true at the motion-to-dismiss stage.  *See Guertin v. Michigan*, 912 F.3d 907, 916 (6th Cir. 2019).

[2]We will refer to the Defendants-Appellees collectively as "Heartland" because HCR, the parent company, "uses that brand name in its hospice operations."  R. 69 (1st Am. Compl. at 4, ¶ 6) (Page ID #478).

their non-terminal illnesses. *Id*. at 17, ¶ 34 (Page ID #491). Meanwhile, Heartland leeched millions of dollars from the federal government in payments for unnecessary hospice care. *Id*. at 43, ¶ 88 (Page ID #517).

## A. Heartland's Scheme

Heartland orchestrated its alleged scheme through incentives, punishments, and training. To incentivize recruitment of hospice patients, Heartland paid out bonuses to regional directors of operations, administrators in charge of the hospice agencies, and its "sales team"—equal to 30% of their salaries—if they met "targets" for admitting and retaining hospice patients. *Id*. at 15–16, ¶¶ 31–32 (Page ID #489–90). Heartland set the targets based on its revenue goals. *Id*. at 15–16, ¶ 31 (Page ID #489–90). It authorized the sales team to ask prospective patients to consent to hospice treatment, rather than curative care, before physician "Medical Directors" received any information regarding patients' medical history and prognosis. *See id*. It even incentivized registered nurses employed as "Patient Care Coordinators" to distort clinical records of patients' medical conditions and progress in a way that would enable the Medical Directors to certify patients as hospice-eligible. *Id*. at 16–17, ¶¶ 33–34 (Page ID #490–91). They, too, would receive a 30%-of-salary bonus if Heartland met its targets. *Id*. Heartland also handed out paid vacation hours to the clinical and non-clinical staffs of the facilities that increased their "census," or patient enrollment, the most within each corporate region. *Id*. at 17–18, ¶ 35 (Page ID #491–92). On the flipside, Heartland threatened to terminate sales team members and clinical staff if they fell short of their required census count. *Id*. at 18, ¶ 36 (Page ID #492).

To cover its tracks, Heartland "trained its hospice agency nurses and other clinical personnel . . . to focus their documentation [of patients' clinical status], not on truthful clinical evidence of a patient's stability or need for curative treatment, but instead on purported clinical indicia of medical decline." *Id*. at 22–23, ¶ 43 (Page ID #496–97). Clinical personnel were trained to avoid "Ship Sinkers" like "improving," "stable," or "no change" because they could render patients hospice-ineligible. *Id*. Guided by the "Heartland Best Practice" manual, executives, regional officers, and local administrators enforced Heartland's corporate-wide practice of "negative charting" designed to paint patients as in decline. *Id*. at 22–23, ¶¶ 43–44 (Page ID #496–97). At the same time, clinicians were encouraged to use phrases that suggest

hospice eligibility like "new skin tears," "unable to carry on a conversation without shortness of breath," "new episodes of chest pain," and "eating only sweets, snacks – refusing meals." *Id.* at 23, ¶ 45 (Page ID #497).

Effectively useless physician oversight paved the way for claims with no sound clinical basis to go forward. Heartland did not require its physician Medical Directors to personally examine patients, or to review the underlying clinical records, "before accepting non-physician employees' conclusions that patients were terminally ill." *Id.* at 25, ¶ 52 (Page ID #499). And where Medical Directors or other physicians did determine that patients should be discharged, they were vetoed. Local hospice facility "Directors of Clinical Services"—who were registered nurses, not physicians—were authorized to override physicians' recommendations of discharge. *Id.* at 27–28, ¶ 56 (Page ID #501–02). "Heartland likewise . . . authoriz[ed] *regional* and . . . *corporate-wide* administrators to veto, override, or ignore recommendations [of discharge] by physician Medical Directors . . . ." *Id.* at 28, ¶ 57 (Page ID #502). On the occasions when Heartland did discharge patients, it was company policy not to review the patients' records to determine when they became hospice-ineligible and how much money should be refunded to the government. *Id.* at 35, ¶ 76 (Page ID #509).

Holloway also learned that Heartland was misleading the Medicare auditors. She witnessed a Heartland senior officer direct a physician to change a patient's general "cancer" diagnosis to "Stage IV cancer" in response to an audit request, without evidence supporting the change. *Id.* at 38, ¶ 80 (Page ID #512). When requests came in from Medicare auditors to review patients' files to verify hospice-eligibility, "Heartland's practice . . . was to refuse to respond to such requests as to patients Heartland knew (or realized upon inquiry) were not eligible for hospice services." *Id.* at 37–38, ¶ 79 (Page ID #511–12). Failing to respond came with a minor penalty worth one month's payment, whereas answering honestly would make Heartland liable for refunds stretching back months or years. *Id.* Answering honestly could also prompt the auditors to search for evidence of fraud. *Id.* By accepting the minor penalty, Heartland strategically averted a substantial loss of profits and the discovery of its scheme. *Id.*

Corporate executives were at the helm of Heartland's scheme. *Id.* at 18–19, ¶ 37 (Page ID #492–93). Heartland Vice President Mike Reed, for example, encouraged employees to err

on the side of certifying hospice-eligibility. *Id.* He reassured them that they would not be penalized if an auditor later rebuked their determination. *Id.* Executives would also use monthly conference calls to "badger and discipline" local and regional managers who failed to meet census requirements. *Id.* at 19, ¶ 38 (Page ID #493). And, of course, executives doled out incentives and trained employees. *See supra* p. 4. "[T]hrough its corporate headquarters and its most senior corporate leadership[, Heartland] acted with reckless disregard (a) for the truth of patients' actual medical conditions and needs, (b) for the clinical accuracy of the resulting clinical records as to each such patient[], and (c) for the medical necessity of resulting claims to Medicare and Medicaid for resulting hospice services." *Id.* at 19–20, ¶ 39 (Page ID #493–94).

Thus, Heartland employees certified patients as hospice-eligible under Medicare regulations, even though many of them were not. *Id.*; *see also* 42 C.F.R. § 418.20. The clinical documents that purportedly supported the certification of hospice-eligibility were distorted. R. 69 (1st Am. Compl. at 20, ¶ 40) (Page ID #494). "Heartland did not and could not reasonably rely on or affirm the accuracy of physician certifications made in reliance on its non-physician staff's clinical records, since Heartland knew that its marketing, training and clinical practices had substantially corrupted the reliability of such records as a credible and neutral basis for making such physician certifications." *Id.* at 25, ¶ 51 (Page ID #499). Accordingly, Holloway alleges that the claims based on false certifications that Heartland submitted to Medicare and Medicaid for payment are "factually and legally false." *Id.* at 21–22, ¶ 42 (Page ID #495–96).

## B.  Procedural History

Holloway brings this action under three provisions of the FCA: presenting false claims under 31 U.S.C. § 3729(a)(1)(A) (2009), use of false records or statements under § 3729(a)(1)(B), and wrongfully retaining government funds under § 3729(a)(1)(G). *Id.* at 45–49, ¶¶ 92–108 (Page ID #519–23). She filed her initial *qui tam* complaint against Heartland Hospice, Inc., HCR ManorCare, Inc. ("HCR"), and The Carlyle Group on August 24, 2010. R. 1 (Compl. at 1, ¶ 1) (Page ID #1). After the government declined to intervene, R. 55 (Election to Decline Intervention) (Page ID #184), Holloway amended her complaint on August 27, 2018 to delete claims against Heartland Hospice, Inc. and the Carlyle Group, and to add claims against HCR Home Health Care and Hospice, LLC, Heartland Hospice Services, LLC, and ManorCare

Health Services, R. 69 (1st Am. Compl. at 1–2, ¶ 1) (Page ID #475–76).  The conduct implicated in this case began "no later than 2004 and continu[ed] to the time of the filing of [the] First Amended Complaint."  *Id.* at 11–12, ¶ 24 (Page ID #485–86).

Heartland initially moved to dismiss this action on August 6, 2018, R. 68-1 (Motion to Dismiss) (Page ID #230), and then moved to dismiss the First Amended Complaint on December 3, 2018, R. 82 (Motion to Dismiss) (Page ID #650).  The district court entered judgment dismissing this action with prejudice on June 26, 2019.  R. 86 (Judgment) (Page ID #1141).  Although the district court held that Holloway's complaint was not barred by a prior public disclosure, the court dismissed her suit for insufficient pleading.  *U.S. ex rel. Holloway v. Heartland Hospice, Inc.*, 386 F. Supp. 3d 884, 899, 902 (N.D. Ohio 2019).  We have jurisdiction over Holloway's timely appeal. *See* 28 U.S.C. § 1291.

## II.  DISCUSSION

To be eligible for hospice care under Medicare or Medicaid, a patient must be certified by a physician as "terminally ill"—meaning that the patient's prognosis "is for a life expectancy of 6 months or less if the terminal illness runs its normal course."  42 C.F.R. § 418.20(b); 418.22(b)(1).  Without that certification, the hospice provider is not entitled to payment.  *See* § 418.20; 42 U.S.C. § 1395f(a)(7).  For the certification to be valid, the hospice medical director "must consider at least the following information:  (1) Diagnosis of the terminal condition of the patient; (2) Other health conditions, whether related or unrelated to the terminal condition; [and] (3) Current clinically relevant information supporting all diagnoses."  42 C.F.R. § 418.25(b).  Submitting a fraudulent certified claim for payment for care provided to a hospice-ineligible patient constitutes a false claim.  *See* 31 U.S.C. § 3729(a); *Prather*, 838 F.3d at 761.  Holloway alleges that Heartland submitted false claims by knowingly or recklessly certifying patients' eligibility for hospice care and billing for those claims.

For Holloway to survive a motion to dismiss, she must surmount the public-disclosure bar and the heightened standard for pleading FCA claims.  We begin and end with the public-disclosure bar.

The FCA bars *qui tam* actions that merely feed off prior public disclosures of fraud. *See* 31 U.S.C. § 3730(e)(4)(A) (2010); *U.S. ex rel. Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 970 (6th Cir. 2005). Congress amended aspects of the public-disclosure bar on March 23, 2010, and we have decided that the amendments are not retroactive. *U.S. ex rel. Antoon v. Cleveland Clinic Found.*, 788 F.3d 605, 614–15 (6th Cir. 2015); Patient Protection and Affordable Care Act, § 10104(j)(2) Pub. L. 111-148, 124 Stat. 119, 901–02 (Mar. 23, 2010); *compare* 31 U.S.C. § 3730(e)(4)(A) (2010) ("The court shall dismiss [a *qui tam*] action or claim . . . if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office or other Federal report, hearing, audit, or investigation; or (iii) from the news media, unless . . . the person bringing the action is an original source of the information.") *with* 31 U.S.C. § 3730(e)(4)(A) (1986) ("No court shall have jurisdiction over an [FCA action brought by a *qui tam* relator that is] based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media unless . . . the person bringing the action is an original source of the information.").

Holloway's complaint alleges FCA violations spanning from 2004 to the date of filing, so both the pre- and post-amendment versions of the public-disclosure bar apply.[3] Under either version of the public-disclosure bar, Holloway must demonstrate "(1) that the factual premise of [her] claim was not publicly disclosed before [she] filed the lawsuit, or (2) even if it was, that [she] was the original source of the information." *U.S. ex rel. Advocates for Basic Legal Equal., Inc. v. U.S. Bank, N.A.*, 816 F.3d 428, 430 (6th Cir. 2016). Under the post-amendment public-disclosure bar, a relator qualifies as an "original source" if she either (1) "voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based" "prior to a public disclosure" or (2) "has knowledge that is independent of and materially adds to the

---

[3]After the 2010 amendments, the public-disclosure bar is no longer jurisdictional. *U.S. ex rel. Advocates for Basic Legal Equal., Inc. v. U.S. Bank, N.A.*, 816 F.3d 428, 433 (6th Cir. 2016). Because Heartland argued its motion to dismiss under Rule 12(b)(6), and Holloway has not taken issue with that, we will presume that a Rule 12(b)(6) motion to dismiss is appropriate for both the pre- and post-amendment claims.

publicly disclosed allegations or transactions, and [she] has voluntarily provided the information to the Government before filing an action under [the FCA]." 31 U.S.C. § 3730(e)(4)(B) (2010). Critically, Holloway has not argued that she is an original source. She waived this argument in the district court by stating that it was "irrelevant," *see* R. 83 (Resp. to Mot. to Dismiss at 8–9 n.20) (Page ID #958–59), and she has made no argument on appeal that the original source exception applies. This might have been the type of case in which the new allegations materially add to what has been publicly disclosed. We cannot say one way or the other in light of Holloway's decision to waive this line of argument.

## A. Overview of Potential Public Disclosures

Because Holloway does not argue that she was an original source, she either must show that the purported prior disclosures were not "public," or that their contents did not "disclose" her allegations.[4]

First, Heartland points to a Department of Justice ("DOJ") settlement of FCA claims with SouthernCare Inc., an entity that fraudulently billed Medicare for hospice-ineligible patients but that is in no way connected with Heartland. *See* R. 82-14 (SouthernCare Settlement) (Page ID #874). The accompanying DOJ press release describes only misconduct by SouthernCare Inc., not an industry-wide scheme. *Id.* Similarly (and second), Heartland points to a *qui tam* complaint filed by Holloway against her former employer and its affiliates, which are also in no way connected with Heartland. *See* R. 82-2 (CLP Compl.) (Page ID #702). The complaint portrays a similar scheme to that alleged here. *See id.* Critically, all that these actions have in common is the same type of fraud in the same industry—without a shared corporate parent. We have never inferred an industry-wide disclosure from a set of allegations against a particular company. That can only work the other way around, when the prior disclosures describe "industry-wide abuses and investigations." *See U.S. ex rel. Gear v. Emergency Med. Assocs. of*

---

[4]The list of potential "public" disclosures shrank with the 2010 amendments to exclude filings and rulings associated with state court proceedings. *U.S. Bank*, 816 F.3d at 430; *compare* 31 U.S.C. § 3730(e)(4)(A) (2010) *with* 31 U.S.C. § 3730(e)(4)(A) (1986). That change does not affect our analysis of the purported disclosures in this case.

*Ill., Inc.*, 436 F.3d 726, 729 (7th Cir. 2006).  Accordingly, neither of these sources disclosed the fraud alleged in Holloway's complaint.

Third, Heartland points to a report issued by the Health and Human Services Office of Inspector General ("OIG report") that found that four percent of claims "did not meet certification of terminal illness requirements."  R. 82-16 (OIG Report at ii, 16) (Page ID #897, 916).  The OIG report does not itself constitute a public disclosure.  Although a report need not use the word "fraud" to qualify as a disclosure, it still must carry an inference of wrongdoing. *U.S. ex rel. Burns v. A.D. Roe Co.*, 186 F.3d 717, 724 (6th Cir. 1999) (quoting *U.S. ex rel. Jones v. Horizon Healthcare Corp.*, 160 F.3d 326, 332 (6th Cir. 1998)).  The OIG report even falls short of that.  It calls out what it perceives to be a compliance problem stemming from the technical nature of the claims process.  *See* R. 82-16 (OIG Report at iii, 17) (Page ID #898, 917). Its recommended action is not an investigation, but instead better education, training, and monitoring.  *See id.*  There is no insinuation of fraud, but at most noncompliance.

That said, a disclosure can arise from multiple documents taken together, rather than from a single document.  *See U.S. ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 512 (6th Cir. 2009).  Courts use the following formula to explain that concept:  "[I]f X + Y = Z, Z represents the *allegation* of fraud and X and Y represent its essential elements.  In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed."  *Jones*, 160 F.3d at 331 (quoting *U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994)).  In the district court's view, the OIG report "further marks, however slightly, the trail of fraud in this case" by "set[ting] out the then-current state of affairs."  *Heartland Hospice*, 386 F. Supp. 3d at 896.  But we do not see how a disclosure of the "current state of affairs" matters because the South Carolina complaints expressly allege fraud in the first place (*i.e.*, the South Carolina complaints are the "Z" and there is no need for an "X" or "Y").  At best, the OIG report lends some support to Heartland's industry-wide disclosure theory, which we have already rejected.

Finally, Heartland points to three *qui tam* complaints filed in the United States District Court for the District of South Carolina against HCR ManorCare—Heartland's parent

company—and other Heartland entities ("South Carolina complaints"). *See* R. 82-6 (Litwin Compl.) (Page ID #794); R. 82-7 (Olson Compl.) (Page ID #803); R. 82-8 (Williams Compl.) (Page ID #813). The government declined to intervene, and the initial complaints were unsealed on July 9, 2007. R. 82-9 (Unsealing Order at 1–2) (Page ID #824–25). Each of the relators jointly stipulated to dismissal on November 12, 2008. R. 82-13 (Joint Stipulation of Dismissal at 2–9) (Page ID #865–72).

Holloway's first line of defense against the South Carolina complaints is that they are not "public" under the amended public-disclosure bar. The amended statutory text bars claims that were publicly disclosed in a federal proceeding "in which the Government or its agent is a party." 31 U.S.C. § 3730(e)(4)(A)(i) (2010). Holloway argues that a *qui tam* relator is not the government's agent and, therefore, that the case is not "public" unless the government intervenes. District courts are split over this question, and we have yet to weigh in. *See, e.g.*, *U.S. ex rel. Forney v. Medtronic, Inc.*, 327 F. Supp. 3d 831 (E.D. Pa. 2018); *U.S. ex rel. Gilbert v. Virginia College, LLC*, 305 F. Supp. 3d 1315 (N.D. Ala. 2018). Courts that have adopted Holloway's position reason that a *qui tam* relator is not the government's agent because the relator is not authorized by statute to act in the government's place, is not labeled an "agent" under the statutory scheme, and is not subject to the government's control. *See Forney*, 327 F. Supp. 3d at 842–44. A majority of courts have rejected that reasoning and instead have held that a *qui tam* relator is the government's agent because the government "is the real party in interest," "the relator is the assignee of the Government's damages claim," and the government "exerts a fair amount of control over *qui tam* litigation." *Gilbert*, 305 F. Supp. 3d at 1324. Even when the government declines to intervene, it "still receives copies of all pleadings and deposition transcripts, can move to stay discovery if it interferes with an ongoing criminal or civil investigation, and has the right to approve or reject a stipulated dismissal." *Id.* (citing § 3730(b)(1), (c)(2)(D)(3), (c)(4)). It "may even intervene at a later date upon a showing of a good cause and subsequently dismiss a case over the relators' objections." *Id.* (citing § 3730(c)(2)(D)(3); § 3730(c)(2)(A)). The district court in this case added that Holloway's position "would render the phrase 'or its agent' . . . meaningless." *Holloway*, 386 F. Supp. 3d at 895. "Who, if not the private relator, is the government's agent?" *Id.* We are persuaded by the majority of district courts' and our own district court's reasoning and hold that the *qui tam*

relator is, in all cases, the government's agent under § 3730(e)(4)(A)(i). Accordingly, the South Carolina cases are public under both versions of the public-disclosure bar, despite the fact that the government did not intervene.

Now we turn to the substance of the South Carolina complaints. The relators in the South Carolina cases were registered nurses who worked at a single South Carolina Heartland hospice facility until they were fired for calling out its practice of making false claims for Medicare payments for patients who were not terminally ill. *See* R. 82-10 (Litwin Am. Compl. at 7, ¶ 26) (Page ID #838); R. 82-11 (Olson Am. Compl. at 9, ¶ 37) (Page ID #850); R. 82-12 (Williams Am. Compl. at 7, ¶ 26 (Page ID #860). They initially alleged FCA violations alongside wrongful termination and tort claims. R. 82-6 (Litwin Compl. at 5–8, ¶¶ 29–53) (Page ID #798–801); R. 82-7 (Olson Compl. at 6–8, ¶¶ 29–53) (Page ID #808–10); R. 82-8 (Williams Compl. at 6–8, ¶¶ 29–53) (Page ID #818–20). Specifically, the relators alleged that Heartland "engaged in a practice and pattern of altering medical records or omitting crucial information from the charts," and in doing so, "systematically misrepresented . . . information concerning the patients' diagnosis and need for hospice care." R. 82-6 (Litwin Compl. at 5, ¶¶ 21, 26) (Page ID #798); R. 82-7 (Olson Compl. at 5, ¶¶ 21, 26) (Page ID #807); R. 82-8 (Williams Compl. at 5, ¶¶ 21, 26) (Page ID #817). According to all three relators, there were "several occasions" when they were told not to verify a patient's hospice-eligibility and "to let the office handle it so they could continue to identify the patient as being eligible." R. 82-6 (Litwin Compl. at 5, ¶ 25) (Page ID #798); R. 82-7 (Olson Compl. at 5, ¶ 25) (Page ID #807); R. 82-8 (Williams Compl. at 5, ¶ 25) (Page ID #817). When the relators instead insisted that their patients' diagnoses were not "supported in their medical charts," they were fired. R. 82-6 (Litwin Compl. at 5, ¶ 25) (Page ID #798); R. 82-7 (Olson Compl. at 5, ¶ 25) (Page ID #807); R. 82-8 (Williams Compl. at 5, ¶ 25) (Page ID #817).

Two of the three South Carolina relators ultimately abandoned their FCA claims in their amended complaint, but all three added examples of particular patients they thought were hospice-ineligible. R. 82-10 (Litwin Am. Compl. at 4, ¶¶ 17–23) (Page ID #835–38); *id.* at 8–9, ¶¶ 37–45 (Page ID #839–40); R. 82-11 (Olson Am. Compl. at 5–8, ¶¶ 21–27) (Page ID #846–49); *id.* at 9–11, ¶¶ 41–54 (Page ID #850–52); R. 82-12 (Williams Am. Compl. at 4–7, ¶¶ 17–23

(Page ID #857–60); *id.* at 8–9, ¶¶ 37–45 (Page ID #861–62).**5**  In each example, they stated that they "were told they would be fired if they didn't continue to work with patients whether they met the criteria or not."  R. 82-10 (Litwin Am. Compl. at 4, ¶¶ 17–23) (Page ID #835–38); R. 82-11 (Olson Am. Compl. at 5–8, ¶¶ 21–27) (Page ID #846–49); R. 82-12 (Williams Am. Compl. at 4–7, ¶¶ 17–23 (Page ID #857–60).  They also alleged for the first time that Heartland was "attempting to develop a 'census' of patients under continuous care."  R. 82-10 (Litwin Am. Compl. at 7, ¶ 26) (Page ID #838); R. 82-11 (Olson Am. Compl. at 9, ¶ 37) (Page ID #850); R. 82-12 (Williams Am. Compl. at 7, ¶ 26 (Page ID #860).  All in all, "twenty-two (22) of the approximately forty-three (43) patients [at the South Carolina facility] failed to meet the criteria and should [have] be[en] discharged."  R. 82-10 (Litwin Am. Compl. at 7, ¶ 26) (Page ID #838); R. 82-11 (Olson Am. Compl. at 9, ¶ 37) (Page ID #850); R. 82-12 (Williams Am. Compl. at 7, ¶ 26 (Page ID #860).  Because the South Carolina complaints concerned the same corporate parent and the same type of fraud implicated in this case, we will analyze more fully below whether they bar Holloway's *qui tam* action.

**B.  The South Carolina Complaints**

Having discarded three of the four potential public disclosures, we assess whether Holloway's action is barred by the South Carolina complaints.  Our decision could, in theory, turn on which version of the public-disclosure bar applies because the amendments are not retroactive.  *See Antoon*, 788 F.3d at 614–15.  Previously, the 1986 version of the statute barred claims that were "based upon" allegations or transactions that had already been publicly disclosed.  31 U.S.C. § 3730(e)(4)(A) (1986).  Now, the statute bars claims "if *substantially the same* allegations or transactions" have been publicly disclosed.  31 U.S.C. § 3730(e)(4)(A) (2010) (emphasis added).  We must decide whether the South Carolina complaints disclosed the fraud alleged in Holloway's complaint under either version of the public-disclosure bar.**6**

---

**5**It does not matter that the relators dropped the FCA claims because "the disclosure is not required to use the word 'fraud' or provide a specific allegation of fraud," let alone a specific allegation of an FCA violation.  *See Poteet*, 552 F.3d at 512.

**6**Both parties believe that they should prevail under either version of the public-disclosure bar.  Heartland states in a conclusory fashion that the amendments do not affect our analysis.  Appellee Br. at 37 n.12.  Holloway neither disputes nor concedes that, and she cites both pre- and post-amendment precedent.  *See* Reply Br. at 16.

Heartland argues that Holloway's claims must be dismissed under either version of the public-disclosure bar because Holloway's allegations depict essentially the same scheme as that described in the South Carolina complaints.  Appellee Br. at 37–38.  We agree and hold that Holloway's claims must be dismissed under either version of the public-disclosure bar.

### 1.  The Pre-Amendment Public-Disclosure Bar

We begin with the pre-amendment public-disclosure bar.  Prior to the 2010 amendments, we held that a claim is "based upon" a prior public disclosure when it is "'supported by' the previously disclosed information," *Poteet*, 552 F.3d at 514 (quoting *U.S. ex rel. McKenzie v. Bellsouth Telecomm., Inc.*, 123 F.3d 935, 940 (6th Cir. 1997))—meaning that a "substantial identity exists between the publicly disclosed allegations or transactions and the *qui tam* complaint," *id.* (quoting *Jones*, 160 F.3d at 332).[7]  In applying the substantial-identity test, we held that the relator's claims are based on prior public disclosures where "essentially the same . . . scheme" was "the primary focus" of each.  *Id.  Qui tam* actions are barred if they are "based *even partly* upon public disclosures."  *McKenzie*, 123 F.3d at 940 (emphasis added).

Heartland asserts, based on *McKenzie*, that Holloway's claims are barred because they are at least partly based on the South Carolina complaints.  *McKenzie* was our first opportunity to decide how to interpret the "based upon" language in the public-disclosure bar.  In doing so, we declined to adopt the Fourth Circuit's interpretation of "based upon," which would have required a relator to personally know about the prior disclosures, and instead adopted the Tenth Circuit's approach.  *Id.*  We stated that, under a plain text analysis, the Tenth Circuit interpreted "based upon" to "include[] any action based *even partly* upon public disclosures."  *Id.* (citing *United States ex rel. Precision Co. v. Koch Indus.*, 971 F.2d 548, 552 (10th Cir. 1992)) (emphasis added).  The Tenth Circuit reasoned that "Congress chose not to insert the adverb 'solely,' and we cannot, because to do so would dramatically alter the statute's plain meaning."  *Id.* (quoting *Precision*, 971 F.2d at 552).  After explaining the Tenth Circuit's textual analysis, we noted that "[t]he Tenth Circuit later clarified its interpretation by explaining that a court 'must determine whether 'substantial identity' exists between the publicly disclosed allegations or transactions

---

[7]We have also used the term "substantial likeness."  *See Poteet*, 552 F.3d at 514.

and the qui tam complaint." *Id.* (quoting *U.S. ex rel. Fine v. Advanced Sciences, Inc.*, 99 F.3d 1000, 1006 (10th Cir. 1996)).

We have described the test for "substantial identity" as whether the relator's complaint and the prior disclosures depict "essentially the same" scheme. *Poteet*, 552 F.3d at 514. That, in turn, is informed by the principle that *qui tam* actions will be barred only when "enough information exists in the public domain" to put the government on notice of the fraud alleged. *Walburn*, 431 F.3d at 975; *Poteet*, 552 F.3d at 512. The simple reason is that the entire point of *qui tam* actions is "to prosecute fraud of which the government is unaware." *U.S. ex rel. Dingle v. BioPort Corp.*, 388 F.3d 209, 215 (6th Cir. 2004).

To decide whether the government is already on notice of the fraud alleged, we ask whether the relator "merely 'adds details' to what is already known in outline." *U.S. Bank*, 816 F.3d at 432 (quoting *U.S. ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 370 (7th Cir. 2016)). We can presume that the government is on notice of particular frauds once a general disclosure of fraud has been made. *See id.* at 431–32; *Dingle*, 388 F.3d at 215; *U.S. ex rel. Gilligan v. Medtronic, Inc.*, 403 F.3d 386, 391 (6th Cir. 2005). Thus, relators cannot avoid the public-disclosure bar "by focusing [their] allegations . . . on sub-classes of potential claims covered by the initial [disclosure]." *U.S. Bank*, 816 F.3d at 432. It is not enough to allege new, slightly different, or more detailed factual allegations. *Dingle*, 388 F.3d at 215; *Poteet*, 552 F.3d at 514.

For instance, in *Dingle*, we barred a relator's *qui tam* action alleging a scheme in which a company supplied the U.S. government with FDA-noncompliant vaccines. 388 F.3d at 215. Prior public disclosures revealed that the FDA had cited the company for unspecified "deviations" from FDA requirements and that there were allegations that the company's vaccine was not FDA-approved. *Id.* at 214. Because the prior disclosures were "more general and could have referred to several types of fraud," the government was on notice of the particular scheme that the relator alleged. *Gilligan*, 403 F.3d at 391 (citing *Dingle*, 388 F.3d at 213). The same was true in *Gilligan*, where the relators alleged that a company caused doctors and hospitals to submit false claims to Medicare for use of its FDA-noncompliant pacemakers with malfunctioning leads. *See id.* Prior allegations disclosed that the leads were not safe, that there

was manufacturing fraud, and that there were design deviations. *Id.* Even though the new allegations concerned a "slightly different type of fraud," the prior allegations "were sufficiently general, and like the allegations in *Dingle*, could have encompassed the claim of manufacturing fraud and design deviations surrounding the . . . leads." *Id.* "So long as the government is put on notice to the potential presence of fraud, even if the fraud is slightly different than the one alleged in the complaint, the *qui tam* action" must be dismissed. *Dingle*, 388 F.3d at 214–15.

Heartland contends that that is exactly what we have in this case—Holloway is simply adding new, slightly different, or more detailed allegations to what has already been disclosed in the South Carolina complaints. We agree. Both sets of allegations were levied against the same corporate parent for the same type of fraud. Both accuse Heartland of making false claims for payment from Medicare for hospice patients. Both allege a systemic and patterned practice of altering or omitting information from clinical documents to make these patients appear to be terminally ill. Both allege that staff were fired if they challenged this practice, and that Heartland set a "census," or required number of patients, for enrollment. We acknowledge, as the district court observed, that Holloway's complaint "alleges a complex, sophisticated scheme" that targets corporate-wide conduct. *Heartland Hospice*, 386 F. Supp. 3d at 898 (quotation omitted). But we disagree with the district court's conclusion that the scheme that Holloway alleges "differ[s] in both degree and in kind from" the South Carolina complaints. *Id.* at 899. Even if the South Carolina complaints were focused on a single hospice facility, the allegations against Heartland as a whole were sufficiently general and alike to those alleged here such that the government was put on notice of the corporate-wide conduct alleged in this case. We therefore hold that Holloway's claims are barred by the pre-amendment public-disclosure bar.

## 2. The Post-Amendment Public-Disclosure Bar

Having held that Holloway's claims do not survive the pre-amendment public-disclosure bar, we must decide whether they surmount the "more lenient" post-amendment public-disclosure bar. *See U.S. Bank*, 816 F.3d at 430. The 2010 amendments to the public-disclosure bar replaced "based upon" with "substantially the same." *See* 31 U.S.C. § 3730(e)(4)(A) (2010). Accordingly, the text now reads, "The court shall dismiss an [FCA] action or claim . . . if substantially the same allegations or transactions as alleged in the action or claim were publicly

disclosed . . . ." *Id.* How we interpret the post-amendment public-disclosure bar is informed by the statutory text and the competing purposes of the *qui tam* provisions.

Prior to the amendments, a majority of circuits adopted interpretations of "based upon" analogous to our "substantial-identity" test, using the same or slightly different language. *See U.S. ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 57 (1st Cir. 2009) (collecting cases). Many circuits described their test as whether "the relator's allegations are *substantially similar* to information disclosed publicly," *see id.* (emphasis added),**8** while others described their test as whether "the allegations in the complaint were *substantially the same* as allegations in the public disclosures," *U.S. ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 572 (10th Cir. 1995) (emphasis added).9 Still others asked whether "material elements" of the allegations were publicly disclosed, *U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 103 (2d Cir. 2010), *rev'd on other grounds by Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401 (2011), or whether the relator made "essentially the same" allegations, *U.S. ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 176 (5th Cir. 2004).10 By the time the public-disclosure bar was amended in 2010, all but one circuit had adopted some version of this interpretation. *See Ondis*, 587 F.3d at 57. The Fourth Circuit was the lonely outlier, interpreting "based upon" as barring suits only if the relator *actually* knew about the public information—a reading the majority of circuits rejected. *See U.S. ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1348 (4th Cir. 1994) (barring suits "only where the relator has *actually* derived

---

**8***See U.S. ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 519–21 (3d Cir. 2007) (substantially similar); *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 910 (7th Cir. 2009) (substantially similar); *U.S. ex rel. Newell v. City of St. Paul*, 728 F.3d 791, 797 (8th Cir. 2013) (substantially similar); *U.S. ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1199 (9th Cir. 2009) (using "substantial identity" and "substantially similar" interchangeably), *overruled on other grounds by U.S. ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121, 1128 n.6 (9th Cir. 2015); *U.S. ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 814 (11th Cir. 2015) (using "substantially similar" and "substantially the same" interchangeably); *U.S. ex rel. Findley v. FPR-Boron Employees' Club*, 105 F.3d 675, 690 (D.C. Cir. 1997) (substantially similar), *overruled on other grounds by U.S. ex rel. Davis v. District of Columbia*, 679 F.3d 832, 838–39 (D.C. Cir. 2012).

**9**The Tenth Circuit has occasionally used the "substantial identity" language that our circuit has used. *See, e.g., U.S. ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1051 (10th Cir. 2004); *U.S. ex rel. Precision Co. v. Koch Industries, Inc.*, 971 F.2d 548, 553–54 (10th Cir. 1992).

**10**The Fifth Circuit also used "substantively identical" in this case. *See id.*

from that disclosure the allegations upon which his *qui tam* action is based" (emphasis added));
*Ondis*, 587 F.3d at 57.

Unsurprisingly, then, the circuits that were in the majority have held that their pre-amendment precedent continues to control, to varying degrees.[11] *See Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 718 (7th Cir. 2017) ("The current version of the statute expressly incorporates the 'substantially similar' standard in accordance with the interpretation of this circuit and most other circuits."); *U.S. ex rel. Reed v. Keypoint Gov't Sols.*, 923 F.3d 729, 743–45 (10th Cir. 2019) (holding that its pre-amendment precedent should "primarily guide" its post-amendment inquiry"); *U.S. ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 812, 814 (11th Cir. 2015) (slotting the new "substantially the same" test into its existing analytical framework); *U.S. ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 208 n.4 (1st Cir. 2016) (stating that "[t]he revised statutory language—'substantially the same'—merely confirms [its] earlier understanding," but also that the amended language "has no substantive effect *in this case*" (emphasis added)).

For our part, we indicated in an unpublished case, *United States ex rel. Armes v. Garman*, that we would continue to be guided by our "based upon" precedent as we embark on interpreting the amended public-disclosure bar. 719 F. App'x 459, 463 n.2 (6th Cir. 2017) ("Because this court had already interpreted the "based upon" language to mean a "substantial identity," *Poteet*, 552 F.3d at 514, the 2010 amendment does not affect our public-disclosure analysis at this second step."). But we have not expressly adopted our pre-amendment precedent in a published case. In one post-amendment case, both versions technically applied, but we used the "more lenient" amended version for the sake of simplicity because the relator would lose either way. *U.S. Bank*, 816 F.3d at 430. We implicitly adopted two principles from our pre-amendment precedent: (1) an action is barred if a prior disclosure puts the government on notice of the fraud alleged in the *qui tam* complaint, *id.* at 431, and (2) a broader prior disclosure bars a

---

[11]"Similar" obviously has a different meaning than "same." "Same" means identical; "similar" means analogous, comparable, or resembling the other. The Merriam-Webster dictionary would have us believe otherwise, as it dubiously defines "same" as (among other things) "something identical with *or similar to* another." *Same*, MERRIAM-WEBSTER ONLINE DICTIONARY (last visited Feb. 14, 2020). We instead are guided by the wisdom of Judge Learned Hand, that "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary." *See Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945).

*qui tam* action based on a narrower set of allegations stemming from the same fraud, *id.* at 432. In another case, we decided that the outcome would be the same under either version of the bar because, even after the amendments, "a common principle remains[:] public disclosure occurs 'when enough information exists in the public domain to expose the fraudulent transaction.'" *Ibanez*, 874 F.3d at 918 (quoting *Antoon*, 788 F.3d at 614–15). We stated that courts must "look at the essential elements of alleged fraud to determine if enough information exists in the public domain to expose the fraudulent transaction." *Id.* "Thus, the public disclosure bar is not implicated—even if one or more of a claim's essential elements are in the public domain—unless the exposed elements, taken together, provide adequate notice that there has been a fraudulent transaction." *Id.* at 918–19. So far, then, we have adopted principles from our pre-amendment cases that are compatible with the amended statutory text.**[12]**

From a textual standpoint, "substantially the same" facially demands a greater degree of similarity between the *qui tam* complaint and the prior disclosures than "based upon" does. And "substantially the same" undoubtedly is more rigorous than "even partly based upon," as we interpreted "based upon" to mean. Without the "based upon" language in the statute, there is no textual hook for *McKenzie*'s "even-partly-based-upon" rule. *See McKenzie*, 123 F.3d at 940 (citing *Precision*, 971 F.2d at 552).**[13]** We can think of no reason why that plain text interpretation of "based upon" should influence our reading of the amended text.

At the same time, we continue to be guided by the statute's general purpose of encouraging genuine whistleblower actions while snuffing out parasitic suits. *See Walburn*, 431 F.3d at 970. The public-disclosure bar was intended to be "wide-reaching," *Schindler*, 563 U.S. at 408, but to stop short of "wip[ing] out *qui tam* suits that rest on genuinely new and material information," *Goldberg*, 680 F.3d at 935–36. In light of this purpose and the statute's

---

**[12]**We have not cited *McKenzie* in any of our binding post-amendment precedent. *See U.S. Bank*, 816 F.3d 428; *Ibanez*, 874 F.3d 905.

**[13]**The Tenth Circuit, which created the "even-partly-based upon" rule in *Precision*, conspicuously has avoided citing to that case for that rule in its post-amendment precedent. *See Reed*, 923 F.3d at 743–45. It has instead emphasized its substantial-identity test from *Fine*, 99 F.3d at 1006. *See Reed*, 923 F.3d at 743–45. Moreover, it has said only that prior precedent should "*primarily* guide [its] substantially-the-same inquiry." *Reed*, 923 F.3d at 745 (emphasis added).

plain text, we read "substantially the same" as more sensitive to differences between the *qui tam* complaint and prior disclosures than the prior "based upon" language.

Holloway's claims, nevertheless, cannot survive the more lenient post-amendment public-disclosure bar. As we have already described, Holloway's allegations are substantially the same as those made in the South Carolina complaints. If anything, Holloway's allegations add some new details to describe essentially the same scheme by the same corporate actor. We accordingly hold that Holloway's claims must be dismissed under the amended public-disclosure bar as well. Because both versions of the public-disclosure bar apply, we need not address whether Holloway's allegations were sufficient under Federal Rule of Civil Procedure 9(b) or the limited exception to that standard that we announced in *Prather*, 838 F.3d 750. The district court rightly dismissed Holloway's claims.

## III. CONCLUSION

We **AFFIRM** the district court's judgment of dismissal because Holloway's action is barred in light of prior public disclosures.