**Reversed and Opinion filed April 7, 2026**



In The

# Fifteenth Court of Appeals

### NO. 15-25-00034-CV

## STATE OF TEXAS, Appellant

## V.

## ALEXANDRA ALVAREZ, JOSHUA LAFOUNTAIN, DR. CHRISTINE ELLIS, D.D.S., Appellees

**On Appeal from the 459th District Court
Travis County, Texas
Trial Court Cause No. D-1-GN-19-004849**

### OPINION

Alexandra Alvarez, Joshua LaFountain, and Christine Ellis, D.D.S. commenced *qui tam* actions under the Texas Medicaid Fraud Prevention Act alleging that multiple orthodontists fraudulently submitted claims for Medicaid reimbursement and the administrator reviewing those claims had fraudulently approved them. After many years and multiple proceedings, Alvarez, Ellis, and LaFountain sought a share of the proceeds of the State's settlement of claims against the administrator. The State challenges the trial court's award of a share of the proceeds on multiple grounds. For the reasons explained

below, we reverse and render judgment in favor of the State.

## BACKGROUND

The Texas Medicaid Fraud Prevention Act (TMFPA)[1] is a "powerful tool" for targeting fraud against the Texas Medicaid program. *In re Xerox Corp.*, 555 S.W.3d 518, 525 (Tex. 2018) (orig. proceeding). The TMFPA authorizes the attorney general to investigate and bring actions against individuals or entities that defraud the Medicaid program in violation of the Act. *Id.* (citing Tex. Hum. Res. Code §§ 36.051–.055). The Act also, through *qui tam* provisions, "deputizes private citizens to pursue a TMFPA action on the government's behalf." *Id.* (citing Tex. Hum. Res. Code § 36.101). A person filing such an action, known as a relator, is required to serve a copy of the petition on the attorney general. Tex. Hum. Res. Code § 36.102(a). The State has the option to intervene in such a *qui tam* suit or decline to take over the action. *Id.* §§ 36.102(c), .104(a)–(b). If an action is successful, a relator is entitled to a percentage of the proceeds, including proceeds of a settlement. *Id.* § 36.110.

Xerox Corporation and Xerox State Healthcare, LLC[2] (collectively, Xerox) contracted with the State to perform program administration for Texas Medicaid which included evaluating authorization requests submitted to Medicaid by dental providers for approval of orthodontic treatment. Orthodontic treatment is covered by Medicaid if the patient meets certain criteria and the treatment is medically necessary as defined by Medicaid. Alvarez, Ellis, and LaFountain (jointly, appellees) filed separate *qui tam* actions in 2012 against multiple Texas Medicaid

---

[1] The TMFPA was amended in 2023 to include additional state-run health care programs in addition to Medicaid, and is now called the Texas Health Care Program Fund Prevention Act. *In re Sanofi-Aventis U.S. LLC*, 711 S.W.3d 732, 736, 736 n.1 (Tex. App.—15th Dist. 2025, orig. proceeding). The TMFPA in effect at the time appellees filed their suits in 2012 applies here. Cites to the Texas Human Resources Code are to the version in effect in 2012.

[2] Xerox State Healthcare LLC was previously known as ACS State HealthCare LLC.

2

dental providers alleging violations of the TMFPA related to the providers seeking and receiving Medicaid reimbursement for claims that did not meet Medicaid criteria. They also each sued Xerox, alleging that Xerox routinely approved Medicaid claims without verifying that that the claims complied with Medicaid guidelines for reimbursement. The State intervened in each suit.

In May 2014, the State filed its own suit against Xerox for violations of the TMFPA, alleging that

> Xerox fraudulently operated the review process while serving as the Medicaid program administrator. Among other complaints, the State alleges Xerox misrepresented, concealed, or failed to disclose that it was not processing orthodontic prior-authorization requests in accordance with Medicaid policy, was not substantively reviewing the evaluative documentation, and was approving vast numbers of prior-authorization requests for ineligible services. The State claims that rather than conducting a rigorous review, Xerox actively concealed the fact that unqualified and inadequately supervised clerical employees routinely "rubber stamped" orthodontic prior-authorization requests. According to the State, Xerox's actions were unlawful, compromised the Medicaid program's integrity, and directly or indirectly caused the State to pay millions of dollars for unauthorized orthodontic services to Medicaid patients.

*State v. Ellis*, 681 S.W.3d 501, 506–07 (Tex. App.—Austin 2023, no pet.). Around this time, "the State sought and received the agreement from appellees to dismiss or abate their respective *qui tam* actions." *Id.*

In February 2019, the State and Xerox entered into a settlement agreement. The agreement provided, among other things, that:

- The State "intervened in a number of other actions brought in its name by *qui tam* relators (collectively, and together with any other such *qui tam* actions filed in state or federal court alleging claims arising out of Covered Conduct, the 'Related Actions')."
- The parties had "reached a full and final settlement of any and all

of the claims, or potential claims," including those asserted in the "Related Actions."

- The parties allocated some of the settlement amount "towards payment of attorneys' fees, costs, and legal expenses incurred by the State in connection with ... the Related Actions."

- The State agreed to "promptly seek dismissal of all Related Actions filed in Texas state court."

*Id.* at 507–08.

Appellees filed a joint motion in the State's suit against Xerox for determination of their share of the proceeds as relators under TMFPA section 36.110 (the "Joint Motion"). *Id.* at 507. They also later filed a joint motion to intervene, noting that they believed they were "'already proper parties because of their standing as *qui tam* relators in previously-filed, intervened lawsuits against the Xerox defendants in this case' but filed the motion to intervene 'out of an abundance of caution so the Court has a clear understanding of [their] standing to participate in this case.'" *Id.* The State moved to sever the claims seeking an interest in the share of the settlement proceeds from its suit against Xerox. The State explained that the Xerox defendants had no interest in the remaining claims and once the Xerox defendants paid the settlement amount in full, the State would release them. The State stated that the motion to sever "should not, in any way, prejudice" the appellees.

After the trial court granted the motion and severed the Joint Motion into a separate cause number, the State filed a plea to the jurisdiction. *Id.* at 508–09. The State claimed that it was immune from suit as to the claims in the Joint Motion. *Id.* at 509. The State additionally claimed that its immunity was not waived as to the claims brought by Ellis and LaFountain because their *qui tam* claims were based on the same underlying facts as Alvarez's earlier claim and the TMFPA prohibits a person from "bring[ing] a related action based on the facts underlying a pending

4

action brought under this subchapter." *Id.* at 513 (citing Tex. Hum. Res. Code § 36.106). The State asserted that being first to file was a TMFPA statutory prerequisite to suit and accordingly its immunity was not waived because Ellis and LaFountain did not comply with the statutory prerequisite. *Id.* The trial court denied the plea to the jurisdiction, referencing the TMFPA's "purpose and structure." *Id.* at 509–10. The State appealed the denial of its plea and the Third Court of Appeals affirmed. *Id.* at 504.

On remand, appellees filed a renewed motion for determination of relators' share, requesting that the court award them a 17.5% share. The State filed special exceptions, which the trial court denied. The State then filed a motion for summary judgment asserting that appellees actions were barred by the public-disclosure provision which provides that a person may not bring a *qui tam* claim "that is based on the public disclosure of allegations or transactions." Tex. Hum Res. Code § 36.113. The State claimed that news reports, state and federal audits, legislative hearings, and news releases by government agencies were prior public disclosures of Xerox's failure to properly process orthodontic requests. The trial court denied the motion for summary judgment and entered a final judgment awarding appellees $37,160,865 (a 17.5% share of the State's $212,347,800 settlement proceeds) as well as prejudgment interest.

## ANALYSIS

The State raises five issues challenging the judgment: (1) appellees' Joint Motion does not state a cause of action and is barred by sovereign immunity, (2) appellees' should receive no share of the settlement proceeds because their *qui tam* actions were based on earlier public disclosures so they are barred under the public disclosure provision of the TMFPA, (3) Ellis's and LaFountain's *qui tam* claims are barred by the TMFPA's first-to-file provision, (4) The TMFPA does not

authorize the award of pre and post judgment interest against the State, and (5) appellees are entitled to no more than 7% of the settlement proceeds.

## I.        Appellees' Motion for a Share of the Settlement Award Is Not Barred by Immunity.

The State first claims that appellees' Joint Motion does not state a cause of action and is barred by sovereign immunity. Sovereign immunity protects the State from suit and liability, "thereby depriving trial courts of subject-matter jurisdiction over suits against them unless the State consents." *Tex. Dep't of Transp. v. Self*, 690 S.W.3d 12, 19 (Tex. 2024). An immunity challenge is properly raised through a plea to the jurisdiction. *Id.* We review a trial court's ruling on a plea to the jurisdiction de novo. *Id.*

The State claims that when appellees' Joint Motion was severed from the State's suit against Xerox (on the State's motion), appellees had no valid cause of action. The State claims that because the TMFPA does not contain a cause of action authorizing a relator to sue the State to recover a relator's share, appellees have no cause of action on which to base their claims. In the State's prior appeal challenging the denial of its plea to the jurisdiction, the State argued that there was no showing that "the TMFPA clearly and unambiguously waives sovereign immunity to permit their claims against the State." *Ellis*, 681 S.W.3d at 511. While the State did not directly challenge the lack of a cause of action under the TMFPA, the Third Court of Appeals first addressed whether appellees Joint Motion was a "suit" in the context of whether it was authorized under the TMFPA. *Id.*

The Third Court considered the State's immunity challenge by looking to "the plain language of the statutory provisions addressing a *qui-tam* relator's role and entitlement to a settlement share in the context of the TMFPA's statutory scheme." *Id.* The court first noted that the appellees' *qui tam* actions were asserted against Xerox and not the State. *Id.* at 512. The court then explained:

> We also do not believe that appellees' motion—filed within the State's suit against Xerox following the settlement—falls within the meaning of a "suit" at all. *See Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 563–64 (Tex. 2014) (plurality op.) (explaining that "common meaning of the term 'action' refers to an entire lawsuit or cause or proceeding, not to discrete 'claims' or 'causes of action' asserted within a suit, cause, or proceeding" and that "term 'action' is generally synonymous with 'suit,' which is a demand of one's rights in court" (quoting *Thomas v. Oldham*, 895 S.W.2d 352, 356 (Tex. 1995))); *Black's Law Dictionary* 1106 (9th ed. 2009) (defining "motion" to mean "written or oral application requesting a court to make a specified ruling or order"); *see also id.* 897 (defining "intervention" to mean "entry into lawsuit by a third party who, despite not being named a party in the action, has a personal stake in the outcome").

*Id.* at n.8. We agree with the Third Court that appellees' Joint Motion was not a "suit."

We additionally agree with the Third Court that "sovereign immunity did not apply to deprive the trial court of jurisdiction to adjudicate the merits of appellees' joint motion seeking a relator share of the Xerox settlement proceeds." *Id.* at 513. The court explained that the TMFPA expressly contemplates and authorizes a relator to receive proceeds from a settlement when the State intervenes in a *qui tam* action and later settles the relator's allegations. *Id.* at 512 (citing Tex. Hum. Res. Code §§ 36.109(a), .110(d)). But the TMFPA also provides that "[i]f an alternative remedy is pursued in another proceeding, the person bringing the action has the same rights in the other proceeding as the person would have had if the action had continued under [the *qui tam* provisions]." *Id*. (quoting Tex. Hum. Res. Code § 36.109(a)). The court concluded that the State's pursuit of claims raised in a separate *qui tam* suit falls squarely within the meaning of that provision. *Id.* In this case, the State intervened in appellees' *qui tam* actions which appellees agreed to abate. *Id.* The State "filed 'another proceeding'—the separate suit—against Xerox; and then entered into a settlement agreement with Xerox that included settling appellees' claims that they raised on the State's behalf against Xerox in their *qui tam* actions . . . ." *Id.* The settlement agreement between the State and Xerox expressly referenced and settled

7

appellees' *qui tam* actions. *Id.* at 513. The court concluded that "the trial court did not err by concluding that sovereign immunity did not apply to deprive the trial court of jurisdiction to adjudicate the merits of appellees' joint motion seeking a relator share of the Xerox settlement proceeds." *Id.* We agree with this conclusion.

The State acknowledges that appellees could have filed a motion seeking a relator's share in their original *qui tam* suits but claims that a relator is "required" to seek a realtor's share of an alternate proceeding in the original *qui tam* action and not the alternate proceeding. The TMFPA provides that if the State pursues an alternative remedy, a person who brought a *qui tam* action "has the same rights in the other proceeding as the person would have had if the action had continued . . . ." Tex. Hum. Res. Code § 36.109(a). The State does not explain how, if appellees' rights to seek a relator's share in the *qui tam* suit are "the same" as their rights to seek a relator's share in the alternate proceeding, the State does not have sovereign immunity regarding a motion to recover a relator's share in one suit but it does have sovereign immunity in the other. Further, nothing in the federal cases cited by the State indicates that a motion to recover a relator's share must be filed only in the original proceeding and not the alternate proceeding. *See United States ex rel. LaCorte v. Wagner*, 185 F.3d 188, 191 (4th Cir. 1999); *United States v. Wegeler*, 941 F.3d 665, 672 (3d Cir. 2019); *United States v. L-3 Commc'ns EOTech, Inc.*, 921 F.3d 11, 30 (2d Cir. 2019).[3] We agree with the Third court that the trial court had jurisdiction to adjudicate the merits of appellees' Joint Motion. We next turn to the question of whether the

---

[3] The State also cites these cases for the proposition that "federal courts have held that the alternate remedy provision does not confer a relator with the unfettered right to a determination of the relator's share within the alternative proceeding." But each case cited by the State was decided on the facts of the case and each is inapplicable here. *Lacorte*, 185 F.3d at 191 (prohibiting intervention by individuals in a *qui tam* suit because only the government can intervene under statute); *Wegeler*, 941 F.3d at 672 (holding that a *qui tam* relator could not intervene in a criminal proceeding to recover a share of the proceeds under the alternate-remedy provision); *L-3 Commc'ns EOTech, Inc.*, 921 F.3d at 30 (holding that the alternate remedy provision only entitles a relator to a share of the recovery if the *qui tam* action was "pending when the government was choosing what course to pursue").

8

TMFPA's public disclosure provision barred appellees' *qui tam* claims.

## II. Appellees' *Qui Tam* Claims Are Barred by the TMFPA's Public Disclosure Provision.

The TMFPA version applicable to this case provided that

> A person may not bring an action under this subchapter that is based on the public disclosure of allegations or transactions in a criminal or civil hearing in which the state or an agent of the state is a party, in a legislative or administrative report, hearing, audit, or investigation, or from the news media, unless the person bringing the action is an original source of the information.

Tex. Hum. Res. Code § 36.113(b). The TMFPA encourages individuals with knowledge of government fraud to come forward with that information. But the public disclosure bar prevents *qui tam* suits for fraud that is already publicly known. *See United States ex rel. Paulos v. Stryker Corp.*, 762 F.3d 688, 692 (8th Cir. 2014) (recognizing that the federal *qui tam* provision "is designed to promote private citizen involvement in exposing fraud against the government, while at the same time, the public disclosure bar works to prevent parasitic suits by opportunistic late-comers who add nothing to the exposure of the fraud" (citations and internal quotation marks omitted)).

In its motion for summary judgment, the State asserted that appellees' *qui tam* claims were barred under the public disclosure provision because allegations that Xerox fraudulently administered the Texas Medicaid program were already the subject of widespread news reporting, administrative reports, hearings, audits, and investigations. The trial court denied the State's motion. "We review summary judgments de novo, taking as true all evidence favorable to the nonmovant, and indulging every reasonable inference and resolving any doubts in the nonmovant's favor." *First Sabrepoint Cap. Mgmt., L.P. v. Farmland Partners Inc.*, 712 S.W.3d 75, 84 (Tex. 2025) (citation and internal quotation marks omitted). We conclude

9

that the trial court erred in denying the State's motion for summary judgment because the underlying allegations of fraud had already been disclosed in the news media and the claims were barred by the public disclosure provision.

Relators first point out that the State previously argued in Ellis's *qui tam* suit that some of the articles at issue were not public disclosures, and they urge that the State must be held to this prior claim. While it is true that the State previously took the position that the articles were not public disclosures, its prior argument is inapplicable here because the State's prior claim involved a different defendant and not Xerox. In Ellis's *qui tam* suit, an individual orthodontist, Dr. Malouf, filed a motion for summary judgment seeking to have Ellis dismissed as a relator on multiple grounds, including that her claims were based on the public disclosure of the allegations. In response, the State and Ellis jointly argued that there had been no public disclosure of the information in Ellis's petition. But the arguments were specifically aimed at Ellis's claims against the individual provider. A public disclosure bars a claim only if the public disclosure is specific to a particular defendant. *United States v. CSL Behring, L.L.C.*, 855 F.3d 935, 944 (8th Cir. 2017) ("[I]n order to bar claims against a particular defendant, the public disclosures relating to the fraud must either explicitly identify that defendant as a participant in the alleged scheme, *or provide enough information about the participants in the scheme such that the defendant is identifiable*." (alterations in original) (quoting *United States ex rel. Kester v. Novartis Pharm. Corp.*, No. 11 CIV. 8196 CM, 2015 WL 109934, at *8 (S.D.N.Y. Jan. 6, 2015)). It follows that the State is not taking inconsistent positions by arguing that the articles were not public disclosures regarding a specific dental provider, but they are public disclosures regarding Xerox.

Turning to the question of whether appellees' *qui tam* claims were barred

10

under subsection 36.113(b), we recognize that no Texas court has interpreted this public disclosure provision. However, the public disclosure provision of the Federal False Claims Act is analogous to the public disclosure provision of the TFMLA. *See State v. Caremark, Inc.*, 584 F.3d 655, 657 (5th Cir. 2009) (recognizing provisions of the TMFPA are analogous to the Federal False Claims Act). Accordingly, we find federal cases interpreting the similar federal public disclosure provision instructive.[4] *See, e.g., Prairie View A&M Univ. v. Chatha*, 381 S.W.3d 500, 505 (Tex. 2012) (noting that "we have looked to federal law for guidance in situations where the [Texas Commission on Human Rights Act] and Title VII contain analogous statutory language"); *Ellis*, 681 S.W.3d at 506 n.3 ("Because the TMFPA's *qui tam* provisions at issue, including its first-to-file provision, use substantially similar language to the FCA's *qui tam* provisions, *see*

---

[4] The prior version of the public disclosure provision in the Federal False Claims Act provided:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

*United States ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*, 336 F.3d 346, 351 (5th Cir. 2003) (quoting 31 U.S.C. § 3730(e)(4)(A) (2000)). Appellees assert that the Texas public disclosure provision should be interpreted less broadly than its federal counterpart because, unlike the Texas statute, the federal statute is jurisdictional. But both the Texas and federal public disclosure provisions have since been amended. *See* Patient Protection and Affordable Care Act, Pub. L. No. 111-148, Title X, sec. 10104(j)(2), § 3730(e)(4), 124 Stat. 119, 901 (2010); Act of May 25, 2013, 83rd Leg., R.S., ch. 572, § 4, 2013 Tex. Gen. Laws 1536, 1538. The federal public disclosure provision is no longer jurisdictional, but federal courts have continued to utilize the same test to analyze the current version of the public disclosure bar. *See, e.g., United States ex rel. Schweizer v. Canon, Inc.*, 9 F.4th 269, 275 (5th Cir. 2021); *United States ex rel. Holloway v. Heartland Hospice, Inc.*, 960 F.3d 836, 843 (6th Cir. 2020) (noting that the same considerations apply "[u]nder either version of the public disclosure bar."). We decline to interpret the TMFPA public disclosure provision less broadly than the federal provision.

31 U.S.C. § 3729–33, federal jurisprudence interpreting the FCA's comparable provisions is informative.").

Federal courts have set out the following considerations when addressing whether the public disclosure bar applies: "1) whether there has been a 'public disclosure' of allegations or transactions, 2) whether the qui tam action is 'based upon' such publicly disclosed allegations, and 3) if so, whether the relator is the 'original source' of the information." *Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447, 450 (5th Cir. 1995) (citation omitted); *see United States ex rel. v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1353 (11th Cir. 2021) ("We have framed the public disclosure inquiry as a three-part test: (1) have the allegations made by the plaintiff been publicly disclosed; (2) if so, is the disclosed information the basis of the plaintiff's suit; (3) if yes, is the plaintiff an 'original source' of that information.") (citation and internal quotation marks omitted); *United States ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 53 (1st Cir. 2009) (setting out the test as "(1) whether there has been public disclosure of the allegations or transactions in the relator's complaint; (2) if so, whether the public disclosure occurred in the manner specified in the statute; [and] (3) if so, whether the relator's suit is 'based upon' those publicly disclosed allegations or transactions." (alteration in original) (citation omitted). We agree that this test is consistent with the language of the Texas statute and apply it here.

### A. There Was a Public Disclosure of Allegations or Transactions Through the WFAA Reporting.

We first consider the question of whether there was a public disclosure of "allegations or transactions." Federal courts have interpreted "allegation" to mean a direct claim of fraud and "transaction" as facts from which fraud can be inferred. *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 571 (9th Cir. 2016) (citing *United States ex rel. Zizic v. Q2Administrators, LLC,* 728 F.3d 228, 235–36

(3d Cir. 2013) and *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 653–54 (D.C. Cir. 1994)). Many courts use a formula to determine whether fraud can be inferred from the disclosure:

> [I]f X+Y=Z, Z represents the *allegation* of fraud and X and Y represent its essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed.

*Quinn*, 14 F.3d at 654. In the formula, X and Y are the required elements for the inference of fraud: "a misrepresented state of facts *and* a true state of facts." *United States ex rel. Solomon v. Lockheed Martin Corp.*, 878 F.3d 139, 144 (5th Cir. 2017) (quoting *Quinn*, 14 F.3d at 655). The presence of only one "cannot be expected to set government investigators on the trail of fraud." *Id.* (quoting *Quinn*, 14 F.3d at 655).

The State cites multiple news media reports that it claims inferred Medicaid fraud by Xerox. Over several months news station WFAA investigated and issued multiple reports on the issue of Medicaid payments for braces for children and how the amount of those payments in Texas far surpassed Medicaid payments for braces by any other state. The first article referenced by the State was posted online on May 13, 2011, and explained that Medicaid is not meant to pay for braces for cosmetic purposes, but only for "teeth determined to be so crooked they could handicap a child." The article stated that "[c]ritics say the state simply doesn't evaluate claims" and quoted an orthodontist as saying that "[t]here's no legitimated [sic] approval process." The article continued that "Medicaid claims are processed by an outside contractor" and "claims are rejected only if paperwork is incomplete, not on a standard of medical evaluation."

The next month, a WFAA broadcast reported on Medicaid payments for

braces for children under 12 who generally did not qualify for orthodontic care except in very limited circumstances. The focus was on the orthodontic providers, noting that multiple orthodontists had collected over $1 million in Medicaid payments in one year. But the broadcast also mentioned approval of those claims: "News 8 has learned nearly a quarter of all the braces paid for under Medicaid last year in Texas may have been installed by waiving State regulations," and that the "State dental director" had to personally approve cases for children under 12 and 19,000 children "got that special approval from the State last year." The report also explained that Senator Nelson had added two riders to the Texas Department of Health and Human Services' (HHSC) budget. One rider would change "the way dentists are reimbursed," because "clearly we need to see if there are certain companies or individuals that are not being totally honest about what they are doing" and the other would direct the inspector general to "detect, investigate, and prosecute abuse by dentists and orthodontists who participate in the Texas Medicaid Program."

An August 25, 2011 article dug deeper into Xerox's role. The article began that "investigations have revealed hundreds of millions of dollars of questionable Medicaid spending on braces for children." "Medicaid money should only be used on cases of severe deformities, cranial-facial problems, and cleft palates." The article noted that federal investigators were auditing HHSC including the "authorization process for orthodontic treatment under Texas Medicaid" in order to "review the State's controls to ensure that only medically necessary orthodontic cases are paid." The article explained that orthodontic treatment was authorized by Xerox and if state regulations were being followed, the dental director of Xerox would have personally approved over 18,000 children under 12 for braces in one year. Xerox additionally approved 60,000 children over 12 for orthodontic

treatment that year. WFAA requested to see and film the Xerox dental review facilities, but that request was denied due to privacy concerns.

A November 11, 2011 broadcast again addressed Xerox's role, focusing on the money the State spent "processing Medicaid claims, the company that does the work, and how it pays its employees." The report continued that Texas taxpayers paid for braces for 80,000 children on Medicaid the past year and those claims were approved by Xerox. Xerox was "a virtual assembly line of claims processing." A former Xerox employee who had processed dental claims was interviewed and stated that "your tax dollars aren't working. You're paying for services that shouldn't be paid for." She asserted that people were awarded for "ignoring problem claims." The report continued that "[w]hat may be behind the problem goes beyond teeth, braces and dentists. It's the way [Xerox] pays its workers." Xerox paid workers based on the number of claims it processed. "[F]or workers the message is clear: rush the claims through whether they're correct or not."

A broadcast the next month reported that the Texas Senate would be holding investigative hearings to examine how "claims were approved." The report pointed to its prior broadcast stating "part of a News 8 investigation that began with braces and ended up with [Xerox], the company which processes Medicaid dental claims, paying its workers on how many claims they process rather than how well they do the work." Senator Nelson stated in an interview that "it makes me concerned, quite honestly, about where else this is going on" and that "if there was fraud taking place, somebody needs to be accountable for that."

The news reports set out a true state of facts: Medicaid only covers braces in very limited circumstances that require specific approval. The news reports also set out the misrepresented set of facts: Xerox was the private contractor charged with

authorizing orthodontic claims, but under Xerox's policy, its employees rushed through claims, approving claims whether they complied with Medicaid requirements or not.

Appellees claim that these reports did not disclose fraud by Xerox, but rather focused on the State. We disagree with appellees' interpretation of the reports. The reports specifically named Xerox, addressed Xerox's role in failing to properly process claims, and revealed Xerox's policy of encouraging employees to rush through claims rather than properly analyzing them. We hold that the news reports publicly disclosed evidence of a fraudulent transaction by Xerox. *See Zizic*, 728 F.3d at 237 (holding that a fraudulent transaction was publicly disclosed where the true state of facts—Medicare regulations required physician review of certain claims—and the misrepresented state of facts—administrators were under contract to perform physician reviews but failed to do so—were disclosed prior to the *qui tam* suit). Because we conclude that the WFAA reporting publicly disclosed the allegations against Xerox, we need not address whether the other legislative reports, hearing, audits, or investigations referenced by the State were public disclosures.

Appellees also claim that the State did not carry its burden to establish any public disclosures because by its own admissions, the State began investigating Xerox's fraud after Appellees had filed suit. The State disputes when it began investigating Xerox, but the timing of the State's investigation is irrelevant to whether the public disclosure provision applies. The statute does not contain any requirement that the State begin an investigation into or even have knowledge of the fraud in order for the public disclosure bar to apply. *See* Tex. Hum. Res. Code § 36.113(b). And no federal court has interpreted the federal public disclosure bar to require a government investigation before a *quit tam* suit is filed in order for the

public disclosure bar to apply. *See, e.g.*, *United States ex rel. Davis v. District of Columbia*, 679 F.3d 832, 836 (D.C. Cir. 2012) (holding that the public disclosure bar prevents suits when the government "already has enough information to 'investigate'" or "where the information 'could at least have alerted law-enforcement authorities to the likelihood of wrongdoing'" (quoting *Quinn,* 14 F.3d at 654); *United States ex rel. Maur v. Hage-Korban*, 981 F.3d 516, 523 (6th Cir. 2020) (explaining that the "key inquiry" in deciding whether a public disclosure has been made is if the disclosures "*could have* 'put the government on notice of the fraud alleged'" (emphasis added) (quoting *Holloway*, 960 F.3d at 851)).

### B. Appellees' Claims Were "Based on" the Public Disclosure of the Allegations or Transactions.

The public disclosure provision bars a *qui tam* suit that is based on the public disclosure. *See* Tex. Hum. Res. Code § 36.113(b) (2011). The Texas Supreme Court considered the phrase "based on" in another context to determine whether a claim was "based on or is in response to" the exercise of free speech under the Texas Citizens Participation Act. *Walgreens v. McKenzie*, 713 S.W.3d 394, 400 (Tex. 2025) (quoting Tex. Civ. Prac. & Rem. Code § 27.003(a)). The Court recognized that a court gives undefined statutory terms their ordinary meaning "unless 'a different or more precise definition is apparent from the term's use in the context of the statute.'" *Id.* at 399 (quoting *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011)). The Court looked to dictionary definitions and lower court interpretations to conclude that "factually predicated on," "main ingredient," and "fundamental part" were helpful in understanding and applying the statutory term "based on." *Id.* at 400 (citations omitted). But the Court rejected a conclusion that "based on" required that a claim be "entirely" based on or "solely dependent" on protected activity. *Id.* at 400–01.

The Texas Supreme Court's interpretation of "based on" is similar to those

adopted by federal courts interpreting the public disclosure provision. "To be based on allegations or transactions of fraud, claims need not be actually derived from public disclosures." *Zizic*, 728 F.3d at 237 (citations and internal quotation marks omitted). Rather, claims are "based upon" a prior public disclosure when "substantial identity exists between the publicly disclosed allegations or transactions and the *qui tam* complaint"—in other words, that "essentially the same scheme was the primary focus of each." *Holloway,* 960 F.3d at 847 (citations and internal quotation marks omitted); *see United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 918 (D.C. Cir. 1999) (holding that a relator's complaint is "based on" public disclosures where the complaint "describe[s] allegations or transactions substantially similar to those in the public domain") (citations and internal quotation marks omitted). But the public disclosure bar still applies even when *qui tam* actions are "based *even partly* upon public disclosures." *Holloway*, 960 F.3d at 847 (quoting *U.S. ex rel. McKenzie v. BellSouth Telecomm., Inc.*, 123 F.3d 935, 940 (6th Cir. 1997)). We turn to appellees' claims to determine whether they were "based on" the public disclosures.

Each Relator brought claims against multiple providers as well as Xerox. We consider only their claims against Xerox to determine whether those claims were based on the public disclosures. In Ellis's petition she alleged that Xerox was paid by the State to screen and pre-approve every application seeking reimbursement from Medicaid for braces. "Xerox engaged in a fraudulent course of conduct over many years and merely rubber stamped almost every single request by providers to place braces on children who did not qualify." She additionally claimed that Xerox "failed to provide proper staffing or adequately trained staff, or both, to evaluate the preauthorization information . . . ." In sum, she claimed Xerox granted preapproval requests without ensuring the accuracy of a

score meant to measure severe deformities, determining the medical necessity of the requested appliances, or determining whether the patient was eligible for services paid by Medicaid.

In Alvarez's petition she alleged that false claims were submitted to Medicaid and "processed by Defendant [Xerox], which routinely approved claims without checking the veracity of whether or not such claims complied with Medicaid guidelines for reimbursement." Those false claims included charges that were double or triple billed, billing for braces that were not medically necessary, and billing for services that were not performed. She further alleged that Xerox breached its contract with the Texas Health and Human Services Commission, as Xerox was to approve only those claims that were compliant with Medicaid criteria and guidelines, but it "routinely and systematically approved claims without regard to whether they complied . . . ." Alvarez also claimed Xerox "was negligent and failed to use due care in approving claims without regard to whether they were in compliance with Medicaid guidelines and regulations."

Essentially both Ellis's and Alvarez's allegations boil down to assertions that Xerox approved Medicaid claims for braces without verifying that the claims qualified for payment. We conclude their actions were "based on" the news media public disclosures as "essentially the same scheme was the primary focus of each." *Holloway*, 960 F.3d at 847 (citations and internal quotation marks omitted).

The allegations in LaFountain's petition against Xerox were not related to its approval for Medicaid for braces. LaFountain claimed that various dental clinics submitted claims for Medicaid reimbursement for procedures such as "baby root canals," crowns, extractions, fillings, scalings, and x-rays that were not medically necessary. He claimed that Xerox was negligent in approving payment of such false claims without regard to whether they complied with Medicaid guidelines and

19

that Xerox had an "activity based compensation" program whereby "the people processing the claims were paid by the number of claims processed, so they had no incentive to closely analyze and reject False Claims."

LaFountain raised allegations of approval for dental claims other than braces, but we conclude those claims were also "based on" the public disclosures. The allegations in the public domain were that Xerox approved orthodontic claims without first determining whether the claims complied with Medicaid requirements. LaFountain alleged that Xerox approved dental claims without determining whether the claims complied with Medicaid requirements. A relator's revelation of specific instances of fraud when the general practice has already been publicly disclosed does not overcome the public disclosure bar. *United States ex rel. Findley v. FPC-Boron Emps.' Club*, 105 F.3d 675, 687–88 (D.C. Cir. 1997). Further, the State had enough information through the public disclosures to investigate Xerox's approval of Medicaid claims that were not medically necessary whether for braces or other dental procedures. *See id.* at 688 (explaining that if a complaint "merely echoes publicly disclosed, allegedly fraudulent transactions that already enable the government to adequately investigate the case and to make a decision whether to prosecute, the public disclosure bar applies"). We conclude that LaFountain's claims were also based on the public disclosures.

**C. The Original Source Exception Does Not Apply to Any of the Appellees.**

Ellis and LaFountain claim that the public disclosure bar does not apply to them because they were original sources of the information. The TMFPA contains an exception to the public disclosure bar if the person bringing the action is an "original source of the information." Tex. Hum. Res. Code § 36.113(b). The statute defines an original source as

an individual who:

(1) has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the state before filing an action under this subchapter that is based on the information; or

(2) has knowledge that is independent of and materially adds to the publicly disclosed allegations and who has voluntarily provided the information to the state before filing an action under this subchapter that is based on the information.

*Id.* We again turn to federal cases interpreting the nearly identical federal definition of original source.[5] "Because qualifying as an original source is an exception to the public disclosure bar, relators will generally bear the burden of demonstrating it applies. . . . Relators are also best situated to know the facts relevant to whether they qualify as original sources." *United States ex rel. O'Connor v. USCC Wireless Inv., Inc.*, 128 F.4th 276, 287 (D.C. Cir. 2025); *see United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1207 (10th Cir. 2006) ("The burden is on [the relator] to show that he is an original source.") (citation omitted). Additionally, the "information on which the allegations are based" means "the information upon which the relators' allegations are based." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 470–71 (2007).

"Direct" and "independent" knowledge have distinct meanings. Knowledge is direct when it is "derived from the source without interruption or gained by the relator's own efforts rather than learned second-hand through the efforts of others." *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 179 (5th Cir. 2004) (quoting *Laird*, 336 F.3d at 355); *Zizic*, 728 F.3d at 239

---

[5] The prior version of the federal public disclosure provision defined original source as:

[A]n individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

*Laird*, 336 F.3d at 352 (quoting 31 U.S.C. § 3730(e)(4)(B) (2000)).

21

("[D]irect knowledge is based on first-hand information, and it is gained by the relator's own efforts, and not by the labors of others . . . ." (citation and internal quotation marks omitted)). "A relator's knowledge is independent if it does not depend on public disclosures." *Zizic*, 728 F.3d at 240 (citation and internal quotation marks omitted). The federal act "seeks to encourage persons with '*first-hand* knowledge of fraudulent misconduct,' or those 'who are either *close observers* or *otherwise involved* in the fraudulent activity' to come forward." *United States ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699, 703 (8th Cir. 1995) (citations omitted).

### 1. Alvarez has Never Asserted that she was an Original Source.

Alvarez did not assert in response to the State's motion for summary judgment that she was an original source of the information on which her allegations were based. Nor does she argue in this Court that she was an original source. Accordingly, we hold that Alvarez's *qui tam* suit is barred because it was based on the public disclosure of allegations or transactions from the news media and she was not an original source of the information. *See* Tex. Hum. Res. Code § 36.113.

### 2. LaFountain did not Have Direct Knowledge of the Information on Which his Allegations Against Xerox were Based.

LaFountain claims that he voluntarily provided the State information about Xerox's fraud before filing his suit and that his knowledge was "direct and independent." LaFountain worked at Bear Creek Family Dentistry assisting in the management and development of various dental clinics. He alleged in his *qui tam* suit that Xerox approved Medicaid claims without checking whether those claims complied with guidelines for reimbursement and that Xerox used activity-based compensation that paid employees by the number of claims processed,

disincentivizing the denial of false claims. LaFountain's information was based on his observations of "what was submitted to [Xerox] and what they approved." But LaFountain admitted that he had no interaction with Xerox and any knowledge was not based on direct interactions with Xerox. Further, any knowledge about Xerox's activity-based compensation program came from a dentist who was conducting training for Bear Creek clinics who told him about the practice.

LaFountain claims that his knowledge is direct and independent because it derived from his employment where "his employer's business model was dependent on Xerox's fraudulent pre-approvals" and that his employer "exploited the very fraud on Medicaid that he alleged Xerox committed." But LaFountain alleged that Xerox approved Medicaid claims without checking whether those claims complied with guidelines for reimbursement and an original source must have "true knowledge as opposed to guesswork or suspicion." *Prather v. AT&T, Inc.*, 847 F.3d 1097, 1104 (9th Cir. 2017) (citation and internal quotation marks omitted). In *United States ex rel. Schumann v. Astrazeneca Pharms. L.P*., 769 F.3d 837, 847 (3d Cir. 2014), for example, a relator claimed that he had direct and independent knowledge where his "experience led him to conclude" that a pharmaceutical company could not have afforded to enter into certain agreements if it were complying with the law. The court rejected this claim, explaining that conclusions that the company intended to pay kickbacks do not qualify as independent knowledge. *Id.* (citing *United States ex rel. Vuyyuru v. Jadhav,* 555 F.3d 337, 353 (4th Cir. 2009) ("[M]ere suspicion that there must be a false or fraudulent claim lurking around somewhere simply does not carry [relator's] burden of proving that he is entitled to original source status.")); *Malhotra v. Steinberg*, 770 F.3d 853, 860 (9th Cir. 2014) (holding that a "generalized suspicion" did not constitute "knowledge" of a kickback scheme).

The information on which LaFountain's allegations were based was that Xerox was approving claims "without regard to whether they complied with Medicaid guidelines and criteria for reimbursement." But LaFountain had no firsthand knowledge of how or why Xerox was approving claims, including whether approval was "without regard" to Medicaid compliance. *See United States ex rel. Aflatooni v. Kitsap Physicians Servs.*, 163 F.3d 516, 525 (9th Cir. 1999) (explaining that "firsthand knowledge" is needed to establish direct knowledge). And because LaFountain had no firsthand knowledge of Xerox's approval procedure, his claims of fraud were pure speculation. *See id.* at 526 (explaining that the fact that a Medicare administrator did not list the referring physician on over 50% of Medicare reimbursements, "does not amount to anything more than pure speculation" that the administrator participated in alleged submission of false Medicare claims).

The Third Circuit's analysis of whether a relator was an original source in *Zizic* is particularly instructive here. 728 F.3d at 228. In that case, Thomas M. Zizic, M.D., filed suit against Medicare administrators alleging that they fraudulently billed Medicare for physician review of benefit claim denials that were never performed. *Id.* at 231. In considering whether Zizic was an original source of the information, the court noted that Zizic had participated in administrative law judge appeals regarding the claim denials and the records in those appeals lacked evidence of the required physician reviews. *Id.* at 233, 239. But the court rejected Zizic's claim that his knowledge was direct because the specific incriminating facts alleged in his complaint were based on the affidavit of a former employee of the administrator who detailed the process of how claims had been denied without the required physician reviews. *Id.* at 233, 239. And Zizic had not discovered the former employee through his own investigation. *Id.* at 239. The

24

court concluded that Zizic's "suspicion of fraud" from his participation in the ALJ appeals was not direct knowledge. *Id.* at 239–40. Similarly here, LaFountain had a suspicion of fraud based on Xerox's approval of Bear Creek's claims. But he had no direct knowledge of the specific incriminating facts alleged in his complaint.

LaFountain cites three cases in support of his claim that his knowledge was direct and independent "since it derived from his personal involvement in Medicaid orthodontics." But none of the cases he relies on support this vague assertion. In the first two cases LaFountain relies on, the courts concluded that relators were not original sources. In *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 912, 921 (7th Cir. 2009), a patient claimed she had direct and independent knowledge that a clinic fraudulently billed the government for care rendered by a doctor when care was actually render by a physician assistant. The court rejected this claim, noting that the patient "made much of the fact that she had direct knowledge that she had been treated by a physician's assistant and not a doctor." *Id.* at 921. But the court noted that the "fraud alleged pertains to billing, not the treatment," and the patient's only knowledge of the clinic's billing practices came from her attorney. *Id.* And in *Reagan*, the court concluded that a relator was not an "original source" because her knowledge was not direct and independent where it was not derived from firsthand observations, but from public records. 384 F.3d at 178–80. These cases do not demonstrate that LaFountain had direct knowledge. LaFountain has never claimed to have firsthand knowledge of Xerox's internal operations. He admitted that his only knowledge of how claims were approved came from a dentist unaffiliated with Xerox.

In the third case cited by LaFountain, *United States ex rel. Harman v. Trinity Industries, Inc.*, No. 2:12-CV-00089-JRG, 2014 WL 47258, at *4–5 (E.D. Tex. Jan. 6, 2014), the district court considered whether a relator was an original source

in a suit related to modifications made to a guardrail design. The relator alleged in his suit that after the modifications, the guardrail, which had been previously approved by the government, no longer functioned as intended. *Id.* at *1. The court concluded that the relator's knowledge was direct and independent where he uncovered the bulk of the facts related to his claim by "(1) applying his professional skill and expertise to private and public documents . . .; and (2) personal investigation" of the guardrails. *Id.* at *4 (footnote omitted). But this case also does not help LaFountain because he does not claim that he conducted any personal investigations, nor did he uncover any facts related to Xerox's approval process through his professional skill or otherwise. *See also Zizic*, 728 F.3d at 239–40, 243 (holding that a relator was not an original source and noting that he had failed to provide any information about an investigation to support his claim of direct knowledge).

Because LaFountain did not have direct knowledge of the information upon which his allegations against Xerox were based, we need not address whether LaFountain voluntarily provided the information to State before filing his action.

### 3. Ellis did not Have Direct Knowledge of the Information on Which her Allegations Against Xerox Were Based.

Ellis is an orthodontist in private practice who also worked as a clinical assistant professor in the Division of Oral Surgery at the UT Southwestern Medical Center. Around 2003 while treating Medicaid patients, she "began to notice that dentists and orthodontists in Texas were using children to commit Medicaid fraud." Those Medicaid patients were receiving orthodontic care that was below an acceptable standard of care or when they did not qualify for treatment. In 2008 she began voicing her concerns regarding fraud in the Texas Medicaid orthodontics program to various individuals and organizations. She eventually contracted with the State in 2011 to review patient files of orthodontists suspected of Medicaid

26

fraud, program violations, or false misrepresentations. Prior to May 2011, she was not focused on Xerox's approval of claims. Rather, she was more focused on patient care and the providers.

In support of her assertion that she is an original source of the information on which her allegations are based, Ellis focuses on the State's prior statements in Ellis's *qui tam* suit against Dr. Malouf that she was an original source. But as the United States Supreme Court explained in *Rockwell*, original-source status requires a claim-by-claim determination. 549 U.S. at 476. Original source status may not be transferred from one claim onto another. *Id.* Accordingly, Ellis may not piggy-back her original-source status in her claim against Dr. Malouf onto her claim against Xerox. *See id.*

Ellis claims her she had direct knowledge of the information in her suit because it was derived from her "personal experiences, insights, treatment of patients, and contacts gained from over 16 years as a practicing orthodontist with experience and familiarity with the Texas Medicaid program, as well as [her] analysis and independent research of materials, anecdotes, and documents." But she only quotes the State's filing in her claim against Dr. Malouf as proof of this contention. She does not point to any actual firsthand knowledge related to Xerox's actions.

As explained above, "direct knowledge" requires firsthand knowledge of the alleged fraud and not mere speculation. *See Aflatooni*, 163 F.3d at 525–26. Ellis alleged that Xerox committed fraud by "merely rubber stamp[ing] almost every single request by providers to place braces on children who did not qualify" and that "Xerox knowingly approved hundreds of thousands of false Medicaid claims." She further claimed that Xerox "failed to provide proper staffing or adequately trained staff, or both, to evaluate the preauthorization information" and these

"[u]nqualified [Xerox] employees almost always provided pre-authorization for orthodontic services for clients who did not qualify." But similar to LaFountain, while Ellis had direct knowledge that Xerox approved false Medicaid claims, she points to no direct knowledge that such approval was done "knowingly" or that Xerox failed to provide proper staffing or training.

Ellis's communications in which she claims she voluntarily provided the information on which her allegations are based to the State further demonstrate that her knowledge regarding Xerox's fraud was based on speculation. First, without citing to the record, Ellis claims that "in 2011 she urged [the Office of Inspector General] to investigate Xerox, and was rebuffed." Urging an investigation does not indicate that Ellis had any direct knowledge. Further, in February 2012, Ellis emailed a policy analyst for the Senate Committee on Health and Human Services, again urging an investigation into Xerox. She noted that she was "finding that few if any of the cases submitted qualified for care under [the] guidelines" and that Xerox "should have been able to see that the case didn't qualify based on their own scoring system." Ellis continued that

> since they missed this scoring issue, I don't think they even looked at the scoring sheet. There had to have been a rubber stamp approval for any case submitted with correct demographic information. There have been rumors of an unofficial policy authorizing all orthodontics . . . . I would suggest that your committee question broadly if such a policy was being allowed and if so who ok'd it and who requested it.

This demonstrates that Ellis's concerns of a "rubber stamp approval" were based on her thoughts and rumors, not on firsthand information.

Ellis also claims that she was an original source of the of the WFAA stories reporting on fraud in the Medicaid program. But the statute requires that an original source voluntarily provide the information on which the allegations are based "to the state." Tex. Hum Res. Code § 36.113. Whether Ellis provided any

information to WFAA is irrelevant to the question of whether she qualifies as an original source under the statute. Because Ellis lacked direct knowledge of the allegations on which her claims against Xerox were based, she was not an original source of that information.

Where a *qui tam* action violates the public disclosure bar, a relator is precluded from recovering a relator's share of a settlement. *United States ex rel. Amico v. Deutsche Bank AG*, No. 15 CIV. 9551 (CM), 2017 WL 2266988, at *5 (S.D.N.Y. May 8, 2017). Accordingly, we sustain the State's second issue and hold that appellees are precluded from recovering a relator's share of the State's settlement. Because we reverse the trial court's judgment on this ground, we do not reach the State's remaining issues.

## CONCLUSION

We conclude that appellees' *qui tam* claims are foreclosed by the public disclosure bar of the TMFPA. The claims were based on the fraudulent transaction publicly disclosed in the WFAA reporting, and appellees were not original sources of the information because they lacked direct knowledge of the information on which their allegations were based. We reverse the trial court's judgment and render judgment that appellees take nothing.

/s/ April Farris
April Farris

Before Chief Justice Brister, Justice Farris, and Chief Justice Adams.[6]

---

[6] The Honorable Terry Adams, sitting by assignment.

29